UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA,   )<br>　　　　　　　　　　　　　　　　)<br>vs.　　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　) <br>JOSHUA PUMA,　　　　　　　　)<br>　　　　Defendant.　　　　　　　) | Case No. 5:22-cr-46-1 |

## APPEAL OF THE MAGISTRATE JUDGE'S DETENTION ORDER

Now comes Joshua Puma, by counsel, and appeals the order of the Magistrate Judge, dated May 23, 2022, ordering Mr. Puma to be detained pending trial. Doc. 14. Mr. Puma respectfully requests this Honorable Court vacate the detention order and release him on conditions, including a condition that he be required to stay at the state hospital, pursuant to the state hospitalization orders. The Magistrate Judge erred in holding that the Government had met its burden by clear and convincing evidence that no conditions or combination of conditions exist to protect any person or the community as the proposed conditions do not contemplate release into the community and, if anything, Mr. Puma's access to treatment would increase overall public safety. This motion is being filed pursuant to 18 U.S.C. § 3145(b).

I. **Procedural history.**

Mr. Puma has been incarcerated in Vermont Department of Correction's ("DOC") custody pursuant to holds in pending state cases for over two years, since about September of 2020. On April 21, 2022, Mr. Puma was indicted on three counts of interstate threats, in violation of 18 U.S.C. § 875(c). The Government alleges that on three separate dates, ranging from September 2021 through November of 2021, Mr. Puma allegedly made threats by phone via calling a Prison Rape Elimination Act ("PREA") reporting line at the jail, while he was incarcerated, and leaving messages on that internal line.

A few months after the alleged threats were made, in January of 2022, the state court ordered an evaluation of Mr. Puma for competency and sanity. The evaluation was conducted in March 2022 by a doctor from Vermont's Department of Mental Health ("DMH") who ultimately opinioned that Mr. Puma was not competent to stand trial. This finding of "not competent" triggered state hospitalization proceedings and on May 17, 2022, as a result of those proceedings, the court issued two orders of hospitalization for 90-days (one for both pending dockets). *See attached,* Defendant's Exhibit A and B (Orders of Hospitalization, Chittenden Criminal Division, Docket no. 22-CR-01942 and 3697-10-19 Cncr, May 17, 2022). Mr. Puma was ordered to the state hospital for an initial period of 90 days. However, due to the federal detainer, he was not able to go from the jail to the state hospital and remained incarcerated.

A few days later, on May 19, 2022, pursuant to a *Writ of Habeas Corpus Ad Prosequendum*, Mr. Puma was arrested on the above docketed federal charges. He appeared for an initial appearance on that date. The government moved for detention, Doc. 8, and a detention hearing was held that same day before the Honorable Judge Kevin J. Doyle. Mr. Puma argued for his release on conditions, but not for release into the community. Rather, he proposed a combination of conditions including that he must stay at the state psychiatric hospital pursuant to the state hospitalization orders. *See id.* The Court rejected the proposed release plan and granted the government's detention motion. Mr. Puma was ordered detained pending trial and remains incarcerated.

II. **Appellate review of detention orders.**

The decision to release a defendant, pre-trial, turns primarily on the factors enumerated in § 3142(g) including: the nature and circumstances of the offense, the strength of the evidence, the background of the defendant, and the level of danger to others that the defendant's release

would pose. *See* 18 U.S.C. § 3142(g). After considering the application of the factors, the judge "**shall** order" the defendant's pretrial release unless the judge determines that the defendant presents an unreasonable risk of flight or a danger to any other person or the community. *See* 18 U.S.C. § 3142(a)-(b)(emphasis added). Thus, "it is only a 'limited group of [defendants]' who should be denied bail pending trial." *United States v. Shakur,* 817 F.2d 189, 194–95 (2d Cir. 1987).

A defendant may only be detained if, after a detention hearing, the court finds that release on bail would pose a danger to "the safety of any other person and the community." 18 U.S.C. § 3142(e). Dangerousness includes "a serious risk that the [defendant] will…attempt to obstruct justice, or threaten, injure, or intimidate… a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). Detention based on dangerousness must "be supported by clear and convincing evidence" of dangerousness. 18 U.S.C. § 3142(f).

When a magistrate judge's detention order is appealed to the district court, the motion to amend the bail conditions must "be determined promptly." 18 U.S.C. § 3145(a), (b). "In reviewing a detention order of a magistrate judge, a district judge should not simply defer to the judgment of the magistrate judge, but rather must reach [his or] her own independent conclusions." *United States v. Enix*, 209 F. Supp. 3d 557, 563-64 (W.D.N.Y. 2016) (citing *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985)).

### III. The 18 U.S.C. § 3142(g) factors support release on conditions to the secure, state psychiatric hospital.

The government has not met its burden to prove by clear and convincing evidence that there are no conditions of release that can be imposed on Mr. Puma to assure public safety. Rather, a review of the § 3142(g) factors support a finding that there *is* a combination of conditions that can assure public safety and risk of flight, primarily, a condition that Mr. Puma

3

must stay at the state psychiatric hospital so long as the hospitalization order remains in place. He would also propose: GPS/location monitoring, a condition that upon discharge from the state hospital any proposal for release must first be reviewed and approved by the Court or he shall immediately return to custody, and all other conditions recommended by the Court or probation. This combination of conditions will assure public safety by keeping Mr. Puma in a secure setting, akin to a jail, while allowing him the mental health treatment he desperately needs to treat the underlying source of the alleged criminal conduct.

      a.  *Nature and circumstances of the charged offense.*

Mr. Puma is charged with three counts of interstate threats, in violation of 18 U.S.C. § 875(c). These threats are alleged to have occurred last fall, in September through November of 2021. At that time, Mr. Puma was in state custody on pending charges and had been incarcerated for two years, since about September of 2020. While incarcerated, Mr. Puma was allegedly calling the PREA reporting line at the jail and leaving messages. *See* Defendant's Exhibit C (DOC PREA reporting line poster). Those messages contained alleged threats towards a state court judge, a defense attorney, and a prosecutor. There were no calls made directly to anyone and all the alleged threats were made to this PREA reporting line. Mr. Puma was in a particularly bad state of mind at the time he left these messages as he had been languishing in jail without adequate treatment, during a global pandemic nonetheless, for two years. He was found not competent only a few months later.

Overall, this factor may weigh against release as there is no denying the concerning nature of the messages. But given the context of the how and where the messages were left, the lack of ability of Mr. Puma to carry out threats when he allegedly made them, combined with his poor mental state at the time of the alleged threats, should all diminish this factor. Regardless, "this is simply the first of the § 3142(g) factors" and is only "one factor in the analysis." *Enix*,

209 F. Supp. 3d at 564-65 (ordering release on conditions where the defendant was "charged with some very serious crimes, including a RICO conspiracy that involved a pattern of racketeering activity involving murder, robbery, kidnapping, drug trafficking, and obstruction of justice as part of its predicate acts"); *see also United States v. Mattis*, 963 F.3d 285, 287 (2d Cir. 2020) (affirming release on $250,000 bond and home detention where the defendants were charged with throwing a Molotov cocktail into a police vehicle).

    b.  *Weight of the evidence.*

The weight of the evidence "is considered the least important" of the § 3142(g) factors. *United States v. Parker*, 65 F. Supp. 3d 358, 365 (W.D.N.Y. 2014). That is both "because it is inherently difficult to assess the Government's case before trial" and because "a defendant must be presumed innocent." *Id.* Based on the information contained in the indictment and in the government's detention motion, as well as information from Mr. Puma's state court counsel, the government's proof as to Mr. Puma's criminal intent to convey a true threat appears quite weak.

In order for the prosecution to succeed, the Government will be required to prove that the messages Mr. Puma left constitute "true threats." *United States v. Choudhry*, 941 F.Supp.2d 347, 351 (E.D.N.Y. 2013) (*citing United States v. Sovie*, 122 F.3d 122, 125 (2d Cir. 1997)). Although section 875(c) doesn't explicitly state the requisite *mens rea* for interstate threats, as the majority of the Supreme Court observes in *Elonis*, "wrongdoing must be conscious to be criminal." *Elonis v. United States*, 575 U.S. 723, 735, 135 S.Ct. 2001 (2015).

Here, there does not appear to be evidence that Mr. Puma actually intended to threaten anyone, as he left these messages on the PREA reporting line messaging system, an internal reporting line at the jail. There were no calls ever made directly to any of the individuals referred to in the messages. Although the line is not advertised as confidential, it is not clear that Mr.

5

Puma would have had a way to know that they would ever be disseminated beyond DOC's internal reporting.

As further example of the evidentiary issues the government may face in this case, even the defense attorney who was the victim of Mr. Puma's threats in the recently concluded State case,[1] remarked in a statement that he merely felt "harassed and annoyed" by Mr. Puma. *See* Defendant's Exhibit E (March 14, 2022, Victim Impact Statement). And in that case, Mr. Puma was directly calling his phone and leaving direct messages of a threatening nature. Even then, the defense attorney clearly didn't interpret Mr. Puma's statements as "true threats," and rather, felt harassed and annoyed and was more concerned about him getting mental health treatment in a residential setting. The Court should find that this factor does not weigh strongly in favor of the government.

    c. *History and characteristics of the defendant.*

Mr. Puma is 35 years old. He is the child of James "Alan" Puma and Janet Puma. He has lived in Vermont for his entire adult life. He has three siblings, two who live in Colorado and one in Vermont. He does not possess a valid passport. Mr. Puma graduated from Rice Memorial High School in 2005. He then attended some college classes at CCV but he never graduated. Mr. Puma has a limited employment history and has been on social security disability since about 2015. He had no criminal charges for the first 27-years of his life. It was only in 2014, at the age of 27, that he was first charged in state criminal court.

Mr. Puma's mental health issues have been evident from a young age. Mr. Puma's mental health issues have worsened significantly during the period of his incarceration and over the last few years. His parents also note that despite numerous mental health evaluations, they feel that

---

[1] And also possibly the defense attorney mentioned in count one of the indictment.

these did not result in adequate treatment. He is diagnosed with high functioning autism, as well as a more recent diagnosis in March 2022 of delusional disorder. It was based on this more recent diagnosis that the state court made a finding that Mr. Puma was not competent to stand trial. Release on conditions to the state hospital would enable him to get a better sense of what his mental health issues are, and to fine tune his medications so as to try to improve his mental condition long term. This is not something that can occur while he is incarcerated. The belief that hospitalization and proper medication will improve his mental condition is also supported by his former state public defender, Sarah Reed, Esq. *See* Defendant's Exhibit D (May 26, 2022, Affidavit of Attorney Sarah Reed, Esq.).

Mr. Puma's significant mental health struggles have caused him to be intertwined him with the criminal justice system in recent years. Yet, he comes from a loving and supportive family, and had a long period of law-abiding existence up until age 27. This factor weighs in favor of his release on conditions to the state hospital where he can be evaluated and treated properly for his conditions, and his condition will hopefully improve.

    d. *Nature and seriousness of the danger posed to any person or the community.*

Although the messages that Mr. Puma left on the PREA reporting line at the jail are concerning, his proposed release plan poses no threat to public safety because it would require Mr. Puma to be held in a secure facility, where he would not be released without notice to the state court and this Court. The state hospital is a secure, locked facility and it often treats those charged with more serious offenses. *See* Defendant's Exhibit F (Vermont Psychiatric Care Hospital Procedure) and G (Vermont Agency of Human Services, DMH, Psychiatric Hospitalization, from https://mentalhealth.vermont.gov/services/pyschiatric-hospitalization , last

7

viewed May 31, 2022). It is similar in security and monitoring abilities to a jail but with the high level of treatment Mr. Puma needs.

Thus, the state hospital is well equipped to address Mr. Puma's issues and the staff are qualified to handle his issues in a therapeutic environment as they routinely have criminal defendants as patients. It is important to recall that Mr. Puma lived almost 27 years with his issues with little or no restraint or criminal charges. He has spent the last two years incarcerated and was finally about to be released to the state hospital for much needed treatment. This treatment would allow him to address his mental health needs. Certainly no progress will be made by further incarceration. And indeed, the Court's current order of detention holds Mr. Puma stagnant in the very environment and setting in which he is alleged to have committed the criminal threats charged in this case.

In addition, the state hospitalization order is for 90 days, but it can be extended beyond that. If for some reason DMH tried to discharge Mr. Puma prior to the 90 days, notice must be given to the state criminal court. *See* 12 V.S.A. § 4822 (requires DMH to give notice to the criminal court of discharge and gives the criminal court the ability to review any plans to discharge a defendant from the hospital).

If notice was provided that there was a plan to discharge Mr. Puma from the state hospital, he proposes a condition that, upon discharge, any release plan (including his residence and subsequent treatment program) must be approved by this Court. If it is not approved, Mr. Puma would agree to a condition that he need to return to jail. Thus, under defendant's proposal, there would be multiple assurances that Mr. Puma would not simply be released to the community but rather, should the hospitalization become unavailable, he would need to appear

8

before the state court and the federal court for a review of conditions, or simply be returned to jail.

Overall, this plan presents no risk and it may even present less risk than leaving him where he is as the hope would be that the treatment helps him get better. Indeed, public defender Sarah Reed, Esq., who has known Mr. Puma in the criminal court and treatment court context for multiple years, including when she was assaulted by Mr. Puma in 2019, speaks to this and how with adequate treatment, she has witnessed how his condition improves. *See* Defendant's Exhibit D (May 26, 2022, Affidavit of Attorney Sarah Reed, Esq.).

While the Court might conclude that Mr. Puma poses a risk to any person or the community is obviously concerning based on the statements he made to the PREA reporting line, this is not the relevant question. The key question is whether the government has shown *by clear and convincing evidence* that *no conditions or combination of conditions* can protect any person or the community. Here, the government has not demonstrated that there is a "high degree of certainty" that Mr. Puma will be a danger if he is held at a secure psychiatric hospital. Instead, the proposed conditions of a secure hospital setting, along with GPS monitoring and the other proposed conditions, provides the additional protection that tips the balance in favor of release.

IV. **Conclusion: there are a combination of conditions that will reasonably assure the safety of the community and the Court erred in holding otherwise.**

Defendant's proposal is that Mr. Puma be "released" on conditions to be hospitalized at the state hospital, a secure psychiatric facility, pursuant to the hospitalization order in state court, pending further Federal Court proceedings. The court erred in finding that this release plan would not assure public safety. This release plan would promote public safety because it would ensure that he received treatment in a secure facility, rather than leaving him untreated in the same environment that has led to the present offense.

WHEREFORE, Mr. Puma respectfully requests that the Court grant his appeal from the Magistrate Judge's decision, and that he be released on conditions including that he be released directly to the State of Vermont hospital pursuant to the May 17, 2022, Order of Hospitalization and comply with all other conditions of release imposed by this Court.

Dated:  June 1, 2022

                                      MICHAEL L. DESAUTELS
                                      Federal Public Defender

By:   */s/ Sara M. Puls*_____
       Sara M. Puls
       Assistant Federal Public Defender
       Office of the Federal Public Defender
       95 Pine Street, Suite 150
       Burlington, VT 05401
       802-862-6990