UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,        )
                                 )
vs.                              )
                                 )              Case No. 5:22-cr-46-1
JOSHUA PUMA,                     )
              Defendant          )

## MOTION TO DISMISS THE INDICTMENT

NOW COMES defendant, JOSHUA PUMA, by and through counsel, Sara M. Puls, and

pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), the Fifth Amendment and Section

One of the Fourteenth Amendment, and Article 1, Section 8, Clause Three and the Tenth

Amendment to the United States Constitution, moves this Court to dismiss the three-count

indictment (Doc. 1) which alleges that he made interstate threats, on three separate dates, in

violation of 18 U.S.C. § 875(c).

The indictment must be dismissed for four reasons. First, the indictment fails to allege two

essential elements. On the one hand, the indictment fails to state the jurisdictional element – that

the threats were transmitted in interstate commerce. On the other hand, it insufficiently alleges

essential facts regarding how Mr. Puma's calls to an internal DOC reporting line satisfy the mens

rea for § 875(c) as set forth in *Elonis v. United States*, 575 U.S. 723 (2015). Next, applying

§ 875(c) to the case at hand violates the Fifth Amendment and Due Process, where there was no

notice to Mr. Puma that his actions would cause or constitute a federal crime. Lastly, this

prosecution violates the Commerce Clause. More specifically, Congress's power to regulate

interstate commerce does not extend to threats allegedly transmitted by an inmate using the

state's an internal Department of Corrections reporting line. In addition, applying § 875(c) to

threats allegedly transmitted by an inmate over an internal Department of Corrections reporting

line would significantly alter the federal-state balance, would vastly extend federal police power, and would violate the Tenth Amendment.

## Procedural History

For the entirety of 2021, Mr. Puma was incarcerated in the Vermont Department of Correction's ("DOC") custody, serving a state sentence. During the fall of 2021, Mr. Puma was at Southern State Correctional Facility ("SSCF"). In January of 2022, after his conviction underlying the state sentence he was serving had been vacated upon a successful post-conviction relief petition, he remained in state custody with the cases pending, again. The state court ordered an evaluation of Mr. Puma for competency and sanity. The evaluation was conducted in February 2022, through Vermont's Department of Mental Health ("DMH"). In a report dated March 18, 2022, the evaluating doctor opined that Mr. Puma was not competent to stand trial. This finding triggered state hospitalization proceedings. On May 17, 2022, as a result of those proceedings, the state court issued two, 90-day orders of hospitalization to take effect the same day.

However, Mr. Puma was never transferred to the state hospital because, just a few weeks earlier, he had been indicted on three counts of transmitting interstate threats, in the above docketed Federal case, in violation of 18 U.S.C. § 875(c). In sum, the Government alleges that on three separate dates, from September 2021 through November of 2021 (during which time Mr. Puma was in state custody), he called the internal, Vermont DOC offender reporting line at the jail and left threatening messages.

Thus, just prior to Mr. Puma's hospitalization in the state cases, on May 19, 2022, Mr. Puma was arrested on the federal threat charges. He was arraigned on May 23, 2022, and Mr.

Puma was ordered detained pending trial. He remains incarcerated and there is a pending issue of whether he is competent to stand trial and a competency evaluation is forthcoming.[1]

## Summary of Facts

The Prison Rape Elimination Act ("PREA") was passed unanimously by Congress in 2003. The purpose of the act is to "provide for the analysis of the incidence and effects of prison rape in federal, state, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape."[2] In addition to creating a mandate for significant research, it also supported major efforts in many states' correctional systems, including drafting standards for eliminating prison rape. *Id.* As a result, inmates in Vermont's DOC prisons have the ability to call the "VT DOC Incarcerated Individual Reporting Line" (otherwise known as the "Offender Reporting Line" or the PREA "555 line") to report sexual misconduct or other related concerns. *See* Ex. A (Jan. 2022 emails from Vermont DOC, PREA Director).

---

[1] To the extent the Government may argue that this motion cannot be heard while the competency issue is pending, Mr. Puma argues this Court *should* hear his motion as soon as possible. Defendant's motion argues that this prosecution violates the Constitution and the Court has no jurisdiction. In that case, Mr. Puma has a right to have the issue decided as soon as possible because if the prosecution is fatally flawed, the Court would also have no power to hold him in pretrial detention (for competency or otherwise). To deny hearing this motion until the competency issue is determined would violate Mr. Puma's due process rights.

In addition, defense's motion is based on purely legal arguments and is the type of motion that "[m]ust be made before trial." Fed. R. Crim. P. 12(b)(3). Rule 12(d) further states that in ruling on motions, "[t]he court must decide every pretrial motion before trial unless it finds good cause to defer a ruling. The court must not defer ruling on a pretrial motion if the deferral will adversely affect a party's right to appeal." There is no "good cause" to defer the ruling on this motion as again, if the government has failed to state a claim, the issue of defendant's competency to stand trial is moot.

In terms of the timing for a competency hearing, the Second Circuit has held that if the Court is unwilling to grant an adjournment, such a hearing may even be held *during* the trial. *See Brown v. Doe*, 2 F.3d 1236, 1247 (2nd Cir. 1993). Thus, although a criminal defendant may not be convicted or forced to *stand trial* unless they are mentally competent, the issue need not be determined before trial, let alone before a motion to dismiss for failure to state a claim and jurisdictional challenges.

[2] *See* National PREA Resource Center, Prison Rape Elimination Act, https://www.prearesourcecenter.org/about/prison-rape-elimination-act (last visited on July 26, 2022).

The reporting line is discussed in DOC's SSCF's inmate handbook, which is provided to inmates in hard copy and on inmate tablets. *See* Ex. B (Jan 2022 emails re: 555 Line). It notes, "[a]ll calls from unit phones are recorded and may be monitored," and, "[a]nyone intentionally providing a <u>false statement of sexual victimization</u> will be held accountable through DOC policy and procedures and may be charged criminally." *See* Ex. C (SSCF Resident Handbook) at 14 (emphasis added). The handbook states that, "[m]essages that are received which are not an emergency and/or don't express that your safety or well-being are at risk <u>will not be investigated</u>. You will be directed to follow the normal grievance process in such events." *Id.* at 15 (emphasis added).

The policy is also outlined in a one-page summary, provided to inmates, entitled "VT DOC incarcerated Individual Reporting Line," *see* Ex. D (555-guidance to the inmates), and explains that an inmate can call and leave a message and it will be, "reviewed by Central Office and sent to central and local leadership to initiate an investigation into your allegation." *Id.* The DOC "Central Office" is located in Waterbury, Vermont. This summary also states that calls are recorded and may be monitored, and that you may be charged criminally for intentionally providing a *false statement* of sexual abuse. *Id.* Threats are not mentioned. GlobalTel Link is not mentioned, nor is it discussed that messages may be saved on a server that is out of state.

In a memorandum dated November 16, 2021, from DOC to inmates, it states that, "[t]his is not a complaint or request line…These calls are not appropriate and will not be responded to." Ex. D. In a section entitled, "What Happens When I Call?" it further states that, "[y]ou will be able to leave a message that will be listened to by administrative services in Central Office… Calls for any other issues [other than allegations of sexual abuse] will not be investigated." *Id.*

An investigation into Mr. Puma's threatening phone calls was initiated back in November 2020, but no state charges were filed regarding these calls. In the fall of 2021, law enforcement

4

and DOC became increasingly worried – they believed Mr. Puma was going to be released or "maxed out" in July 2022. The investigating officer notified all the individuals who had been mentioned in the calls, including prosecutors and law enforcement. The investigation and federal involvement coincided directly with a belief of Mr. Puma's impending release.

By September 2021, Mr. Puma had been incarcerated for over a year and was incredibly frustrated. He was struggling with mental health issues related to his extended incarceration, during a global pandemic, where there were lengthy periods of quarantine, lock-down, and isolation. He was frustrated with his past defense attorney, the prosecutor, and the trial court judge who had been involved in his state cases. He began calling the internal reporting line and leaving rambling messages, often more than one a day. However, Mr. Puma was *not* alleged to have made any direct threats to *anyone* at the jail. *See* Bates 44.02.

In email exchanges from January 2022, the government attempted to establish jurisdiction to charge Mr. Puma federally. *See* Ex. E at 3. In response to the question of whether the line is "an entirely internal phone line," the DOC PREA Director answered, "Yes," and explained that "It can only be used in the institutions by the I/I." *Id.* at 4. In addition, she noted that, "[t]he calls are recorded and stored in GTL," but later she admitted, "I honestly have no idea where the calls live." *Id.* at 2-3. A later email inquired as to where the server phone calls for "GTL" are stored. In a response, a "Field Service Manager" for ViaPath Technologies stated, "The ICMv recordings are stored in our data center in Texas." *See* Ex. F. No discovery was provided to show *when* the recordings are stored in such a data center, before they are reviewed by DOC or after, nor was ay discovery provided about whether the individual communications specifically made by Mr. Puma were ever sent across state lines.

The indictment, filed on April 21, 2022, sets forth three counts of transmitting "interstate threats" in violation of 18 U.S.C. § 875(c). It alleges that on three different dates:

in the District of Vermont, defendant JOSH PUMA, for the purpose of issuing a
threat and with the knowledge that the communication would be viewed as a threat,
transmitted in interstate commerce a communication containing a threat to injure the
person of another, specifically, PUMA called a Vermont Department of Corrections
reporting line which is maintained by GlobalTel Link and stated he would kill a
Vermont State Court Judge and a defense attorney.

And count three alleges, in addition, a threat to kill a Vermont State Court Judge.

## **Memorandum of Law**

I.   **The indictment fails to allege the essential elements of a crime and must be
dismissed.**

The indictment fails to allege a crime because it fails to establish two essential elements of

the charged offense. First, the indictment states only that the Vermont DOC reporting line the

calls were made on is "maintained by GlobalTel Link" – it fails to state any factual basis for the

essential element that Mr. Puma *transmitted* a communication in interstate commerce. Second,

the indictment fails to allege essential facts constituting the mens rea of the offense charged as it

does not descend into the particulars of how Mr. Puma knowingly and intentionally transmitted a

threat in interstate commerce, where he was told the line was an internal-Vermont-DOC line, he

never made direct calls to any of the individuals he allegedly threatened, he was informed that

only *false* reports would be investigated, and he was an inmate in Vermont calling the Vermont

DOC Central Office.

The indictment in this case alleges violations of 18 U.S.C. § 875(c) "Interstate

Communications," which makes it a crime to: "transmit[] in interstate or foreign commerce any

communication containing any threat to kidnap any person or any threat to injure the person of

another." Thus, the elements of a § 875(c) violation are:

> 1) that the defendant threatened to kidnap or to injure someone, as charged in the
> Indictment; 2) that the threat was transmitted in interstate (or foreign) commerce;
> and 3) that the defendant transmitted the threat knowingly and intentionally.

*See* Leonard B. Sand, *Modern Federal Jury Instructions-Criminal*, § 31.02 (2012) (modified) (Sand notes that the subjective intent to threaten is a required element in a § 875(c) offense after the Supreme Court's ruling in *Elonis v. United States*, 575 U.S. 723 (2015)).

When an indictment fails to allege the essential elements of the crime charged, it offends both the Fifth and Sixth Amendments. *United States v. Pirro,* 212 F.3d 86, 92 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 760-61 (1962)). The Fifth Amendment guarantees that, "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury. *See id.* Nor can the defendant be assured that the grand jury acted properly in indicting him. *Id.* Moreover, "[t]he Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Id.* (citing *United States v. Walsh,* 194 F.3d 37, 44 (2d Cir. 1999)).

The Sixth Amendment guarantee of the defendant's right, "to be informed of the nature and cause of the accusation" against him is also offended by an indictment that does not state the essential elements of the crime. *Id.* (citing *Russell,* 369 U.S. at 761; and *Walsh,* 194 F.3d at 44). Because of the Constitutional importance of an indictment, the failure to plead a charge correctly results in dismissal of the charge. For instance, in *United States v. Fistel*, 460 F.2d 157, 160-61 (2d Cir. 1972), the government charged Fistel with a robbery under 18 U.S.C. § 2113(b). However, while it charged Fistel with "unlawfully, willfully and knowingly" possessing bills "which had been unlawfully taken and carried away [from a bank]," it failed to allege that he

intended to "steal or purloin" as is required under a subsection (b) charge. The Second Circuit held:

> The indictment was not only "inartfully" drawn; it was clearly defective in omitting the essential element of "intent to steal or purloin" required to state an offense under § 2113(b). Had appellant filed a motion to dismiss the indictment prior to trial, dismissal would have been required.

*Id.* In short, an indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendment and, as a matter of law, must be dismissed upon motion of the defendant.

> a. *The Government fails to allege that the alleged threats were transmitted in interstate commerce, an essential element of § 875(c).*

First, the indictment fails to state a claim because it does not include the second element of a § 875(c) violation, namely that the threat was transmitted in interstate or foreign commerce. The basic factual allegation in all three counts is that Mr. Puma called the Vermont Department of Corrections reporting line, which is "maintained by GlobalTel Link." However, using a phone line in Vermont to a Vermont agency, that is *maintained* by a company named "GlobalTel Link," does not amount to the essential element of *transmission* of a threat in *interstate* commerce.

The plain language of 18 U.S.C. § 875(c) proscribes transmitting threatening communications "in interstate or foreign commerce." Giving the words used their ordinary meaning, this signifies a movement between states or countries. A mere use of a phone does not, in and of itself, prove the interstate movement required by the statute. The Government must still prove that the phone transmission also moved the communication across state lines. *See United States v. Oxendine*, 531 F.2d 957, 957 (9th Cir. 1976) (reversing conviction where there was insufficient evidence that threats had actually crossed state lines, holding that that prosecutions under 18 U.S.C. § 875(c) do require proof of a transmission in interstate commerce).

The indictment does not allege any such facts, rather, it merely states that the phone line Mr. Puma used is *maintained by* Global Tel Link, a company of unknown geographic location, with no mention of the communication by Mr. Puma actually crossing state lines. Although courts have held that the interstate requirement of § 875(c) was satisfied when the communication was sent over the Internet, including social media, *see e.g. United States v. Dierks,* 978 F.3d 585 (8th Cir. 2020) (threatening posts to Senator's social media website), and even online citizen complaint forms, *see United States v. Stevens,* 881 F.3d 1249 (10th Cir. 2018) (defendant submitted messages to city police department's online "citizen complaint" warning of specific, violent and deadly actions that would be taken against them), there is no support for the proposition that the simple fact that an "entirely internal phone line" that can only be used in the facility by the inmate, which is *maintained* by "GlobalTel Link" (location not specified in the indictment), would be sufficient to establish a communication crossed state lines.

There is some evidence in the government's discovery that the messages left on this internal line, generally speaking, are stored on a server in Texas, *see* Ex. E and F. This fact is not alleged and is not sufficient to satisfy the jurisdictional requirement because the DOC's decision to eventually store data (i.e., the messages containing the alleged threats) on a server in Texas is not the same as proof that the specific calls that Mr. Puma allegedly made necessarily traveled outside of the state on their way to the department's central office. Moreover, it is irrelevant here as on motion to dismiss information as the Court is limited to face of the information. *See United States v. Mertine*, 64 F.Supp. 792 (D. N.J. 1946). Accordingly, the Court must dismiss all three counts of the indictment for failure to state a claim. *See* Fed. R. Crim. P. 12 (b)(3)(B)(v).

      *b.  The Government fails to sufficiently alleged that Mr. Puma knowingly or*
          *intentionally transmitted a threat.*

The indictment also fails to allege essential facts constituting the offense charged, where it alleges that the calls were made from Vermont to a Vermont DOC *reporting line*, and there are insufficient essential facts alleged that Mr. Puma knowingly or intentionally transmitted a threat. *See United States v. Pirro,* 212 F.3d 86, 91 (2d Cir. 2000) (citing *United States v. Mallas,* 762 F.2d 361, 361 (4th Cir. 1985) ("[C]riminal prosecutions…must rest on a violation of a clear rule of law.") (also citing *United States v. Critzer,* 498 F.2d 1160, 1162 (4th Cir. 1974) ("that where the law is vague of highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it.").

The indictment fails to allege an essential element of 18 U.S.C. § 875(c) where it recites the requisite mens rea but includes no essential facts constituting the offense:

> It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars.

*Russell v. United States*, 369 U.S. 749, 765 (1962).

The third element of § 875 requires the government to establish that defendant must have made the statement intending it to be a threat, or with the knowledge that the statement would be viewed as a threat. *Elonis v. United States*, 575 U.S. 723 (2015); *Watts v. United States*, 394 U.S. 705 (1969). The indictment offers no particulars as to how Mr. Puma's calling and leaving messages, from jail, on an internal, DOC reporting line, and never once directly calling the subjects of his ranting messages; that Mr. Puma had any *purpose* of issuing an interstate threat.

There is prejudice from having this element unsupported by sufficient, essential facts where the government has produced no evidence indicating that the calls alleged to have been made by Mr. Puma actually crossed state lines. Rather, the government has produced discovery expressly stating that the line involved is "an entirely internal line" usable only by inmates at the facility.

10

Nor has it provided any evidence about how (or when in the life of a call) the call comes to be stored on a GTL server, which is apparently located out of state. Accordingly, the Court should also dismiss the indictment. *See* Fed. R. Crim. P. 12 (b)(3)(B)(v).

> i. *A longstanding canon of statutory construction requires that to be found guilty of a threat crime, the defendant must have intended to issue a threat.*

Up until 2015, the Second Circuit's test of whether something is a true threat was, "an objective one—namely whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (involving a threat of a government official or employee where defendant had been convicted of 18 U.S.C. § 115(a)(1)(B)). Put another way, the determination of a "true threat" was, under Second Circuit law, an objective one determined from the perspective of a reasonable recipient.

Relatively recently, the Supreme Court, struck down this interpretation of a threat. In *Elonis v. United States*, 575 U.S. 723, 737 (2015), the Supreme Court took up the question of what proof was required to prove a "threat" under 18 U.S.C. § 875(c), the same statute Mr. Puma is charged with violating. In *Elonis,* the underlying conduct involved the defendant posting alleged threats on Facebook under a pseudonym. In his posts, he discussed "crude, degrading, and violent material," where he had allegedly threatened coworkers, his ex-wife, state and federal law enforcement, and a kindergarten class. *Id.* at 727-728.

The Court held that § 875(c) requires that a "threat" be communicated. *Id.* At trial, the *Elonis* jury had been given the aforementioned "reasonable person standard" for determining a true threat. The Supreme Court found this instruction was lacking. "Such a reasonable person standard is a familiar feature of civil liability in tort law but is inconsistent with the conventional

requirement for criminal conduct—*awareness* of some wrongdoing." *Id.* at 737-738 (emphasis in original) (internal quotations and citations omitted).

The Supreme Court's interpretation of § 875(c) turned on the longstanding rule of statutory construction that omission from a criminal statute of criminal intent should not be read as dispensing with it. *Id.* at 734-5. This rule of construction reflects the basic principle that "wrongdoing must be conscious to be criminal." *Id.* at 734 (internal quotations and citation omitted). With § 875(c), the wrongdoing involved in the charge is the threat itself: " 'the crucial element separating legal innocence from wrongful conduct' is the threatening nature of the communication." *Id.* at 737. Thus, the "mental state requirement must [ ] apply to the fact that the communication contains a threat." *Id.* In short, the mental state requirement should not be viewed from the perspective of the recipient of the alleged threat (*i.e.*, the reasonable person) but instead from the perspective of the declarant. "Under these principles, what Elonis thinks does matter." *Id.* at 738 (internal quotations and brackets omitted); *see also* Leonard B. Sand, *Modern Federal Jury Instructions-Criminal*, § 31.02 (2015).

In *United States v. Houston*, 792 F.3d 663, 668-69 (6th Cir. 2015), the Sixth Circuit Court of Appeals, relying on *Elonis* and applying a plain error standard of review, overturned a § 875(c) conviction where the jury instruction adopted the reasonable person standard. Thus, the Sixth Circuit, applying the recent Supreme Court precedent, found error in the very standard previously adopted by the Second Circuit as described in *Turner*. The holding of *Elonis* applies with equal force to Mr. Puma's case.

       ii.  *The indictment fails to sufficiently allege an element that Mr. Puma intended to threaten when he left phone messages on the internal DOC reporting line.*

12

The indictment does not adequately state Mr. Puma's intent to issue a threat. Although it includes the boilerplate language that Mr. Puma, "for the purpose of issuing a threat and with the knowledge that the communication would be viewed as a threat" it does not adequately, "descend to particulars." *Russell v. United States*, 369 U.S. 749, 765 (1962).

Again, the *Elonis* Court made clear that "what [Mr. Puma] thinks does matter." *Elonis*, 575 U.S. 723, 738. And what we know here about Mr. Puma is that, at the time the calls had been made, he had been in jail for over a year. He was not going to be released anytime soon – he was frustrated and clearly struggling with serious mental health issues. He did not convey the communications directly to the individuals he allegedly threatened and based on the materials provided to inmates about the line, he had no reason to know that anyone would hear these messages other than employees of DOC central office. He had no upcoming release date from prison and did not engage in any actual preparation that would indicate he had the intent to threaten. He made many calls a day and often rambled about general frustrations – he did not intend to threaten anyone, rather, these were the ranting frustrations of a mentally ill man who had been incarcerated for a lengthy period during difficult conditions in a global pandemic.

As interpreted by the government in this case, there is essentially a strict liability standard being imposed – Mr. Puma left the messages, and they sound threatening, so he must have had the intent to threaten – regardless of the rest of the context. However, although 875(c) does not explicitly list a requisite mens rea*,* it is not a strict liability office – it requires the intent or purpose to threaten. *See Elonis,* 575 U.S. 723 (holding that the general rule is that a guilty mind is a necessary element in the indictment and proof of every crime, and, as such, courts will interpret criminal statutes to include broadly-applicable scienter requirements, even where the statute by its terms does not contain them). The indictment fails to state a claim where it does not allege

sufficient essential facts that Mr. Puma had any *intent* to threaten, as opposed to mere frustrated venting and attention seeking. As such, the indictment is deficient and must be dismissed. *See* Fed. R. Crim. P. 12 (b)(3)(B)(v).

## II.   Due Process demands that Mr. Puma cannot be liable for criminal conduct which he has not caused and could not reasonably foresee.

The Fifth Amendment's guarantee of due process "requires that a penal statute define a criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (internal quotations omitted) (quoting *Skilling v. United States*, 561 U.S. 358, 402-403 (2010)). The requirement that a criminal offense be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited" has been termed the fair warning requirement. The Supreme Court has identified "three related manifestations of the fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

> First, the vagueness doctrine bars enforcement of "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Second, as a sort of "junior version of the vagueness doctrine," the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

*Id.* at 266-267 (citations omitted). The Supreme Court has observed that "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*. at 267. *See also Maynard v. Cartwright*, 486 U.S. 356, 361 (1988) ("Vagueness challenges to statutes not threatening First Amendment

interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis.").

Furthermore, it is a basic tenant of criminal law that defendants cannot be liable for criminal conduct which they have not caused. *See* 18 U.S.C. § 2. That a person cannot be liable for criminal conduct which he has not "caused" has been a premise of our criminal law from its very origin. Cases such as *Terry v. United States*, 131 F.2d 40, 44 (8th Cir. 1942), and *United States v. Fox*, 95 U.S. 670, 671, 24 L.Ed. 538, 539 (1878), have long recognized that, "(u)pon principle, an act, which is not an offense at the time it is committed cannot become such by any subsequent independent act of (a) party with which it has no connection." *United States v. Kelner*, 534 F.2d 1020, 1022 (2nd Cir. 1976).

In order for the government to state a valid claim, it must show that Mr. Puma was the cause of the criminal conduct, including that it was reasonably foreseeable the calls would constitute interstate communications for which he could be charged with a Federal crime. *See United States v. Lanier*, 520 U.S. 259, 266 (1997); *United States v. Slaughter*, 128 F3d 623 (8th Cir. 1997) (holding that to establish federal coverage under the wire fraud statute, the prosecution must at least show that use of interstate wires was reasonably foreseeable). Where Vermont DOC inmates such as Mr. Puma are told that the PREA reporting line is an "internal line," only reviewed by members of DOC's Central Office, and where that phone line is completely controlled by the state government and DOC, not the defendant, and the innerworkings of how the line operates are not known to the defendant, it is not reasonably foreseeable that such messages would involve the use of interstate communications, nor would Mr. Puma have any reason to know such conduct would constitute a federal offense. Accordingly, the indictment violates Due Process. *See e.g. Grimes v. United* States, 379 F.2d 791, 795 (5th Cir. 1967) (holding evidence did not sustain conviction of aiding and abetting in interstate travel or transportation in aid of gambling

15

enterprise solely because he received a telephone call, of unknown content, from one who was actually committing the primary offense).

Typically, a § 875(c) case involves a defendant using their own personal computer, phone, or some other electronic device that they own, or have exclusive exercise or control over, to communicate the alleged threat, such that it is reasonably foreseeable that such communications would result in interstate transmission of the communication, therefore subject to federal jurisdiction. The issue of foreseeability was raised in *United States v. Kelner*, 534 F.2d 1020 (2nd Cir. 1976), where defendant was being interviewed by a television station and it was being videotaped. In that recorded interview, he threated to assassinate a foreign political leader, who was in the same city. The interview was then broadcast on a television news program.

Mr. Kelner was charged with § 875(c) offenses and argued that he did not "cause" the transmission of a communication in interstate commerce within the meaning of 18 U.S.C. § 2, note 1 supra, "because his alleged threat was made in the context of a television news interview and it was the wholly independent conduct of the television station that resulted in the film of the interview being telecast throughout metropolitan New York on the television news." *Id.* at 1022. There, the Court rejected this argument, noting that defendant *knew* he was being interviewed by a television station when he made the threat, noting he could have foreseen the transmission of the interview. Thus, the Court ultimately held that this fell within the proscription of § 875(c).

Here, where Mr. Puma could not have known that the internal, DOC reporting line he was calling would somehow cross state lines, or even be heard by anyone else other than DOC central office, the government cannot show that the interstate transmission of the communication was reasonably foreseeable, or that he was on notice that such conduct would subject him to Federal prosecution. *See also e.g. United States v. Oxendine*, 531 F.2d 957, 957 (9th Cir. 1976) (reversing conviction where there was insufficient evidence that threats had actually crossed state lines, and

where defendant had used a transmitter incapable of sending messages the distance it would take to cross to state lines). Thus, § 875(c) as applied to Mr. Puma, "violates the 'requirement that a legislature establish minimal guidelines to govern law enforcement' " and thus violates the Fifth Amendment and Due Process and must be dismissed. *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (quoting *Kolender*, 461 U.S. at 358).

III.   **As applied to Mr. Puma, § 875(c) violates the Commerce Clause and the Tenth Amendment. The indictment must be dismissed.**

Not only does the indictment fail to adequately establish that the jurisdictional element of § 875(c), the statute, as applied to Mr. Puma, also constitutes an illegal exercise of Congress's Commerce Clause power, and thus, violates the Tenth Amendment.

In 1932, Congress passed Public Laws of what later became Section 875(c) of Title 18 of the United States Code which criminalizes the transmission of a threat in interstate or foreign commerce to kidnap or injure any person. David C. Potter, <u>The Jake Baker Case: True Threats and New Technology</u>, 79 B.U. L. Rev. 779, 782 (1999). At the time, the telegraph was still the primary mode of interstate communication." *See Kammersell*, 196 F.3d at 1138. In 1934, it was modified to apply to any threat made "in interstate commerce," a change intended to encompass telephone *and* the telegraph. 79 B.U. L. Rev. at 784. In 1939, it was further expanded to cover threats that were not accompanied by an intent to extort. This Public Law was codified as 18 U.S.C. § 875 in 1948. *Id.*

The statute's requirement of <u>interstate</u> threats remains in place. In deciding a challenge to the jurisdictional element, the Tenth Circuit read § 875(c)'s requirement as follows: "once the communication crosses state lines, however briefly, the jurisdictional element is satisfied even if the sender and recipient are both located in the same state." *Kammersell*, 196 F.3d at 1139; *see also United States v. Nissen*, 432 F.Supp.3d 1298 1321 (D.N.M. 2020) (where defendant made

17

threatening cell phone calls from within New Mexico to police dispatch in New Mexico, the Court held that the jurisdictional element was satisfied because the cell phone call crossed state lines where it routed through a switch in Texas).

The Federal Government is one of enumerated powers. Therefore, every time that Congress enacts a law, it must do so pursuant to one of those enumerated powers. *See United States v. Morrison*, 529 U.S. 598, 607 (2000). As the Supreme Court has stated: "The Constitution creates a Federal Government of enumerated powers . . ." and, "[a]s James Madison wrote: 'The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.'" *United States v. Lopez*, 514 U.S. 549, 552 (1995) (quoting The Federalist No. 45).

There is no general federal police power; the power to define and enforce criminal laws lies with the States. *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993); *see also United States v. Lopez*, 514 U.S. 549, 584-85 ("The Federal Government has nothing approaching a police power.")(Thomas, J., concurring). Congress does, however, have the authority to regulate certain activities, and to enact criminal legislation, pursuant to its enumerated powers in Article I, Section 8 of the United States Constitution. U.S. CONST. art. 1, § 8, cl. 3 ("Congress shall have power . . . to regulate Commerce with Foreign Nations, and among the several States, and with the Indian Tribes."). As a practical matter, most of the federal criminal statutes enacted by Congress are done so pursuant to its authority to regulate interstate commerce.

Congress' power to regulate interstate commerce does not extend to a threat allegedly transmitted by an inmate over a Department of Corrections internal reporting line. The application of § 875(c) to such facts is an impermissible intrusion on state sovereignty in violation of the Tenth Amendment. More specifically, through § 875(c), the federal government has assumed the authority to prosecute any and all cases of alleged *intrastate* threats. In so doing, the

18

government has assumed a general police power and has subverted the federal "structure that

leaves local criminal activity primarily to the states." *Bond v. United States*, 134 S.Ct. 2077, 2083

(2014) (hereafter, "*Bond II*"). This exercise of a general police power also precludes the States

acting as laboratories of democracy as the federal system intends. *Lopez*, 514 U.S. at 581

(Kennedy, J., concurring). This overstepping is particularly egregious in the present case where

the prosecution is an attempt to regulate purely local activity, and where the defendant was

already subject to state prosecutions of a similar nature.

 The Supreme Court has explained that while the Commerce Clause provides power to

regulate interstate commerce, that power is subject to other constitutional limitations, including

the Tenth Amendment:

> Congress exercises its conferred powers subject to the limitations contained in the
> Constitution. Thus, for example, under the Commerce Clause Congress may
> regulate publishers engaged in interstate commerce, but Congress is constrained
> in the exercise of that power by the First Amendment. The Tenth Amendment
> likewise restrains the power of Congress, but this limit is not derived from the text
> of the Tenth Amendment itself, which, as we have discussed, is essentially a
> tautology. Instead, the Tenth Amendment confirms that the power of the Federal
> Government is subject to limits that may, in a given instance, reserve power to the
> States. The Tenth Amendment thus directs us to determine, as in this case, whether
> an incident of state sovereignty is protected by a limitation on an Article I power.

*New York v. United States*, 505 U.S. 144, 156–57 (1992).  The Court's decision in *Bond v. United*

*States*, 564 U.S. 211, 223-24 (2011) (hereafter, *"Bond I"*), makes it clear that the Tenth

Amendment protects individuals: "[j]ust as it is appropriate for an individual, in a proper case, to

invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper

case, challenge a law as enacted in contravention of constitutional principles of federalism." *Id*. at

223-24 (noting also at 221 that "[f]ederalism secures the freedom of the individual.").[3]

In *Bond*, the defendant was charged with possessing and using a chemical weapon. *Id*. at

852. The charges arose from the defendant's efforts to seek revenge against her husband's lover

by using a compound that would have given the victim "an uncomfortable rash." *Id*. The Supreme

Court ultimately concluded that the Chemical Weapons Convention Implementation Act did not

reach the efforts of an aggrieved spouse to harass her rival. Instead, the statute had to be

interpreted more narrowly to avoid "convert[ing] an astonishing amount of traditionally local

criminal conduct into a matter for federal enforcement, and involve a substantial extension of

federal police resources." *Id.* at 863 (internal quotations, citation, omitted).[4] The same

considerations that drove the decision in *Bond* are present in this case.

> The limitations that federalism entails are not therefore a matter of rights belonging
> only to the States. States are not the sole intended beneficiaries of federalism. An
> individual has a direct interest in objecting to laws that upset the constitutional
> balance between the National Government and the States when the enforcement of
> those laws causes injury that is concrete, particular, and redressable. Fidelity to
> principles of federalism is not for the States alone to vindicate.

*Id*. It is in this context that Mr. Puma brings his claim.

Still, Mr. Puma acknowledges that decisions have rejected such Tenth Amendment

challenges. *See United States v. Kammersell*, 196 F.3d 1137 (10th Cir. 1999) (holding that where

the jurisdictional element of § 875(c) had been met by transmission of threatening communication

---

[3] *See also Bond I*, 564 U.S. at 221 ("'State sovereignty is not just an end in itself: "Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."'") (quoting *New York*, 505 U.S. at 181 (in turn quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991))).

[4] Nor is *Bond* the only case in which the Supreme Court has read a statute narrowly in order to avoid upsetting the state-vs-federal balance.  In *Jones v. United States*, 529 U.S. 848, 859 (2000), the Supreme Court rejected a reading of the federal arson statue that would "make virtually every arson in the country a federal offense."

from defendant's computer via "instant message," it did not violate the Commerce Clause); *see also United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976)(in upholding defendant's conviction, the court noted: "so long as the crime involves a necessary interstate element, the statute must be treated as valid."). These cases are distinguishable because they rely on the fact that the challenged provision was held to be a valid exercise of Congress' Commerce Clause power by virtue of the fact that the jurisdictional element had been satisfied. That is not the case here. These decisions also miss the distinction between the power granted in the Commerce Clause, the different protections afforded by the Tenth Amendment, and the nation's federal structure.

That the principles of federalism embodied in the Tenth Amendment provide additional or different substantive protections against overreaching federal power is evident in the decisions cited above and in the test devised by the Supreme Court to determine whether a federal law impermissibly infringes on state power. Under that test, a court considers, first, whether the regulation it embodies is within Congress' raw power as being within those enumerated in the constitution. Second, whether, even if so, the means of regulation employed yet impermissibly infringe upon state sovereignty. *New York*, 505 U.S. at 159, 188 (so concluding, in process of holding that while Congress had raw Commerce Clause power to regulate disposal of low-level nuclear waste, means chosen, of effectively requiring states to regulate, impermissibly infringe on state sovereignty). Assuming that § 875(c) is within Congress' enumerated power, the provision impermissibly infringes upon state sovereignty in at least two respects in this case.

First, while in *Kammersell* and *Kelner,* the courts held that proof of a communication crossing state lines satisfied the jurisdictional element, even where the sender and recipient were in the same state, this requirement accomplishes little narrowing of the reach of federal laws regarding threats. This is so because it is invariably the case that in almost all electronic communications, there will be some crossing of state lines, whether it is a cellphone "pinging" a

21

tower out of state or an instant message being routed out of state to a server before reaching its intended recipient instate. Thus, § 875(c) effectively reaches all "threats" no matter how local the activity, no matter if the sender and recipient are in the same state, and no matter whether the sender has knowledge or reason to know that the communication will cross state lines. Under this interpretation, § 875 leaves no aspect of the prohibition of threats to the states alone. The federal government has occupied the entire field in this area, notwithstanding that there is no general police power, and notwithstanding the fact that "our constitutional structure leaves local criminal activity primarily to the States." *Bond II*, 134 S. Ct. at 2083.

Second, the total occupation of the field is not in keeping with the States' "role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *Lopez*, 514 U.S. at 581 (Kennedy, J., concurring); *Bond I*, 564 U.S. at 221 ("The federal structure allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'" (citation omitted)). Here, the infringement is particularly acute because the § 875 prosecution completely usurped the procedural posture in a pending state prosecution, and the state had the ability to prosecute this alleged conduct as well. Mr. Puma was already charged with several state offenses[5] of a similar nature prior to the federal indictment. Those charges remain pending.

Because this interpretation of § 875(c) allows the federal government to prosecute all instances of purely local communications allegedly containing threats, and particularly as applied

---

[5] Indeed, the State of Vermont certainly has more than sufficient criminal statutes with which to charge Mr. Puma for this conduct. *See, e.g.,* Title 13 of V.S.A. § 1026(a)(1) (disorderly conduct threats), § 1026a (aggravated disorderly conduct), § 1026(a)(1) (criminal threatening), § 1026(a)(1) (disorderly conduct by threats), § 1702 (criminal threatening), § 1703 (domestic terrorism).

to this case, Vermont is deprived of its ability to fulfill its role as a "laboratory of democracy" and to test a solution that differs from that imposed by the national government. For these reasons, the present prosecution should be dismissed as a violation of the Tenth Amendment.

WHEREFORE, for all of the foregoing reasons, Counsel respectfully requests that the Court hold a hearing on this motion and grant this motion to dismiss all three counts of the indictment.

Dated:  September 30, 2022

                                                  MICHAEL L. DESAUTELS
                                                  Federal Public Defender

                                    By:    */s/ Sara M. Puls*_____
                                                  Sara M. Puls
                                                  Assistant Federal Public Defender
                                                  Office of the Federal Public Defender
                                                  95 Pine Street, Suite 150
                                                  Burlington, VT 05401
                                                  802-862-6990