UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> v.  ) <br> ) <br> JOSH PUMA, ) <br> ) <br> Defendant. ) | Case No. 5:22-cr-00046-1 |

**MEMORANDUM RESPONDING TO DEFENSE REQUEST FOR REVISED RULE 11 COLLOQUY**
**(Doc. 81)**

On February 1, 2023, defendant Joshua Puma pled guilty to 3 counts of transmitting a threat by means of interstate commerce in violation of 18 U.S.C. § 875(c). In the course of the change of plea colloquy, the court identified the elements of the offense:

> One, the defendant threatened to kidnap or to injure another individual as charged in the indictment;
>
> [T]wo, the circumstances concerning the threat were such that an ordinary, reasonable recipient familiar with the context of the communication would interpret it as a true threat of injury;
>
> [T]hree, the defendant transmitted the threat knowingly and intentionally and for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat; and
>
> [F]our, the threat was transmitted in interstate commerce.

(Hr'g Tr. at 15–16, Feb. 1, 2023 (Doc. 82).) The Government supplied a summary of the facts the prosecution was prepared to prove at trial, including the following:

> On September 30th 2021, October 26th 2021, and November 30th 2021, Puma called a prison reporting line and made threats to kill a Vermont state court judge, to sexually assault a state's attorney, and to kill a local defense attorney. Puma knowingly and intentionally made these threats for the purpose of issuing the threats and with the knowledge that the communications would be viewed as a threat . . . [T]he circumstances concerning the threat would cause a reasonable recipient familiar with the communication to interpret the threats as a true threat of injury.

(*Id.* at 16–17.) Mr. Puma agreed that the summary accurately described the offense and his role in it. (*Id.* at 17.)

A few days prior to the sentencing hearing scheduled for June 28, 2023, the Supreme Court released its decision in *Counterman v. Colorado*, 143 S. Ct. 2106 (2023). At Mr. Puma's request, the court continued the hearing to permit the parties to brief the effect of the Court's decision on this case. The defense has provided a memorandum stating that "the February 2023 plea colloquy is currently insufficient to pass constitutional muster" and requesting the court to "act as it deems necessary to correct the February 2, 2023, plea colloquy." (Doc. 81 at 9.)

## Analysis

The Supreme Court has long included threatening communications within a small number of categories of speech that are not protected by the First Amendment. Other examples include incitement, defamation, and obscenity. *Counterman*, 143 S. Ct. at 2114. The Court has described these forms of speech as "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).

Threatening speech that falls outside the protection of the First Amendment is frequently called a "true threat." "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003). Such speech is not protected by the First Amendment. *Counterman*, 143 S. Ct. at 2114. Prosecution for such speech under state and federal law does not violate the First Amendment. In contrast, threatening words may be hyperbolic, facetious, metaphoric or fall short in some other way from a statement of impending violence. In two recent decisions, the Supreme Court has identified the

*mens rea* element as the means of distinguishing between criminal communications and protected speech.

*Elonis v. United States*, 575 U.S. 723 (2015) addressed the elements of threatening communications under 18 U.S.C. § 875(c)—the same statute under which Mr. Puma has been charged. The language of section 875(c) contains no intent requirement. The Court added a scienter requirement to the elements that a defendant transmitted a communication and that it contained a threat. The first element—a knowing transmission—was never in dispute. *Id.* at 737 ("The parties agree that a defendant under Section 875(c) must know that he is transmitting a communication.").

The dispute in *Elonis* concerned the second element: knowledge that the communication contains a threat. The trial court had instructed the jury that the standard was objective and no different from the standard for determining whether a statement was a "true threat." Conviction required proof that a reasonable person would foresee that a recipient of the statement would interpret it as a serious expression of an intention to harm an individual. *Id.* at 731. The Court imposed a higher subjective standard requiring proof that the defendant knew of the threatening nature of his communication. *Id.* at 739 ("In this case, 'calculated purveyance' of a threat would require that Elonis know the threatening nature of his communication.").

*Elonis* left no doubt that "the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 740. The majority identified an important issue for another day: whether proof of *recklessness* in transmitting a threat would also satisfy the *mens rea* requirement. *Id.* at 740–41. This was no accident. The majority broke with the

3

dissent over just this question. Fortunately for the development of the law, the issue returned in *Counterman*.

In *Counterman*, the Court held that recklessness would also satisfy the *mens rea* requirement. Counterman used Facebook to send threatening messages to a stranger—an entertainer whom he tormented online. He was prosecuted under a Colorado statute that provided only an objective standard for determining whether a communication was a threat. In vacating his conviction, the Court returned to the issue of *mens rea*. In contrast to *Elonis* which addressed the issue of threats in the context of substantive criminal law and the interpretation of a federal statute, *Counterman* concerned the reach of the First Amendment in limiting the authority of a state to punish threatening speech. The Court identified recklessness as the appropriate standard to distinguish protected expression from punishable speech. *Counterman*, 143 S. Ct. at 2117–118.

Turning back to Mr. Puma's case, the defense raises a concern that the court defined the elements of the offense as including both an objective true threat element and a subjective *mens rea* element. The *mens rea* element identified intentional or knowing conduct and did not include the recklessness standard now recognized in *Counterman*.

The first issue is whether the objective test for "true threats" remains a part of the law. It does. Justice Kagan opened her analysis with a recognition of the continued viability of that element. She explained that "[t]rue threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection. And a statement can count as such a threat based solely on its objective content." *Counterman*, 143 S. Ct. at 2113. She returned to this theme a few paragraphs later:

> The "true" in [the term true threat] distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real

4

> possibility that violence will follow (say, "I am going to kill you for showing up late") . . . Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court recently explained. The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end.

*Id.* at 2114 (cleaned up). After *Counterman*, therefore, one element of an offense under § 875(c) remains the determination of whether a reasonable person would interpret the statement as a threat.

*Counterman* addressed and clarified the scope of the separate element of intent. The prosecution must prove one of three versions of *mens rea*: purposeful conduct; knowing conduct; or reckless conduct. Any of these versions will support a conviction. All are subjective measures requiring the jury to determine the mental state of the defendant himself. Although the *Counterman* decision expands the *mens rea* element to include reckless conduct, it does not restrict the prosecution to proving intent on the basis of recklessness only. Finally, the Court rejected the argument that negligence could also serve as a basis for a conviction.

Mr. Puma pled guilty to the section 875(c) offense as it was defined prior to *Counterman*. The elements of the offense described by the court included both that it be "true threat" and the element of intent, the *mens rea* requirement, defined as purposeful and knowing conduct. Mr. Puma admitted to both purposeful and knowing conduct. One would have been enough. Purposeful or knowing conduct remains a sufficient basis for criminal liability under *Elonis* and *Counterman*. That *Counterman* expanded the potential basis for *mens rea* to include recklessness—a category not addressed in the court's colloquy—does not change Mr. Puma's admission to conduct sufficient to meet the requirements of the statute as interpreted in the two decisions.

The court sees no purpose in repeating the change of plea colloquy only to add a lower, less culpable version of the offense. Mr. Puma has already agreed that his conduct satisfied the

5

"true threat" standard and met the more demanding *mens rea* standard of *Elonis*. That he might also have admitted to the lower recklessness standard does not change the basis for the court's acceptance of his guilty plea.

The court will proceed with the sentencing hearing on July 26, 2023.

Dated at Burlington, in the District of Vermont, this 25th day of July, 2023.

                                                Geoffrey W. Crawford, Chief Judge
                                                United States District Court